# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MANUEL A. VELA,

             Petitioner,

      v.

W.L. MONTGOMERY,

             Respondent.

Case No. 1:20-cv-00588-JLT-EPG-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS

(ECF No. 20)

Petitioner Manuel A. Vela is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his second amended petition, Petitioner asserts that there was insufficient evidence to support the jury's finding that Petitioner harbored the required specific intent and that trial and appellate counsel were ineffective. For the reasons discussed herein, the undersigned recommends denial of the second amended petition for writ of habeas corpus.

## I.

## BACKGROUND

On July 18, 2016, Petitioner was convicted by a jury in the Kern County Superior Court of one count of attempted murder (count 1), two counts of assault with a deadly weapon (counts 3, 4), two counts of mayhem (counts 7, 8), and two counts of aggravated mayhem (counts 9, 10). The jury also found true the sentence enhancements for personal infliction of great bodily injury attached to counts 1, 3, and 4, and for personal use of a deadly weapon attached to counts 1, 7–10. (5 CT[1] 1192–1234). Petitioner was sentenced to two consecutive terms of life with the possibility of parole for the two counts of aggravated mayhem with each term enhanced by an

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on July 21, 2021. (ECF No. 24).

1  additional one-year imprisonment term for personal use of a deadly weapon. The sentences on
2  the remaining counts were stayed. (5 CT 1324–27).

3        On February 6, 2019, the California Court of Appeal, Fifth Appellate District reversed
4  Petitioner's convictions for simple mayhem (counts 7, 8) and vacated the related sentences. The
5  judgment was otherwise affirmed. People v. Vela, No. F074383, 2019 WL 457665, at *24 (Cal.
6  Ct. App. Feb. 6, 2019). On April 24, 2019, the California Supreme Court denied the petition for
7  review. (LD[2] 27).

8        On April 24, 2020, Petitioner filed a federal petition for writ of habeas corpus challenging
9  his 2016 Kern County Superior Court convictions on the grounds of insufficient evidence and
10  ineffective assistance of counsel. (ECF No. 1). Petitioner acknowledged that the ineffective
11  assistance of counsel claim was not exhausted. (ECF No. 5). On July 16, 2020, the Court stayed
12  the federal habeas proceeding pending exhaustion of state remedies pursuant to Kelly v. Small,
13  315 F.3d 1063, 1070–71 (9th Cir. 2003). (ECF No. 11). Subsequently, Petitioner's three state
14  habeas petitions were denied. (LDs 29–31). On April 29, 2021, this Court lifted the stay. (ECF
15  No. 19).

16        On May 26, 2021, Petitioner filed the instant second amended petition ("SAP"), asserting
17  that there was insufficient evidence to support the jury's finding that Petitioner harbored the
18  required specific intent with respect to the aggravated mayhem counts and that trial counsel was
19  ineffective.  (ECF No. 20). Respondent filed an answer. (ECF No. 25).

20  **II.**

21  **STATEMENT OF FACTS[3]**

22  **I. Prosecution Case**

23      **A. Eyewitness Testimony**

24          **1. Sammy[4]**

25        At the time of the crime, Sammy and his girlfriend, Jeannette, shared two young
26        daughters and he considered her older children his stepchildren. He sometimes

27  [2] "LD" refers to the documents lodged by Respondent on July 21, 2021. (ECF No. 24).
   [3] The Court relies on the California Court of Appeal's February 6, 2019 opinion for this summary of the facts of the
28  crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
   [4] The jury was informed Sammy had a prior conviction for receiving stolen property.

stayed at Jeannette's house on Townsley Avenue in Bakersfield, but he did not live there. At around 5:00 p.m. on November 22, 2015, Sammy was standing outside the house watching two of Jeannette's preteen sons and their friends play football in the street. He noticed a small, unfamiliar sport utility vehicle (SUV) stopped down the street and he asked Jeannette to see who it was. He testified he saw a woman and a man get out of the SUV and they appeared to be arguing. The couple then got back in the SUV and sped down the street toward Jeannette's house. The children playing football in the street hopped out of the way to avoid being hit and the SUV stopped in front of Jeannette's house.

The man, identified in court as Vela, got out of the SUV from the passenger seat and asked if anyone had a laser.[5] Sammy, who denied at trial that he had been shining a laser, or that he or Jeannette owned a laser, told Vela no one had a laser and asked him what he was talking about. Sammy also told Vela their SUV almost hit his children and to watch where they were going.

Sammy testified Vela responded, "[F]uck you and your kids." Sammy gave Vela a strange look and Vela asked where he was from. Sammy said, "I don't bang," but "[I'm] gonna beat [your] ass." Vela stated he was "from the East Side."[6] Sammy and Vela approached one another. Vela had his fists clenched so Sammy clenched his, too, but he did not throw a punch. Sammy testified he felt threatened, but he did not want to fight in front of the kids. He turned away and Vela punched him in the mouth. Sammy then removed the shirt he was wearing and the two squared off to fight. Sammy testified he clocked Vela several times while jumping around and avoiding Vela's swings. Sammy testified Vela then said, "[O]kay, I got you, fool," retrieved a knife from his vehicle and returned, slashing at Sammy with it.[7] Sammy backed up to avoid being cut, and Jeannette appeared and tried to stop the fight.

Sammy left and went inside Jeannette's house. He then went inside the garage, where he retrieved a wrench and held it behind his back. He denied he went inside to get a knife or a gun, and he denied he owned a gun. He also denied he ever told Jeannette to grab some knives.

As Sammy returned with the wrench behind his back, he saw Jeannette had a metal pole in her hand and she was hitting the ground with it. Vela ran up to Jeannette with the knife and pushed her. She then hit Vela in the stomach once with the pole. Sammy testified that when he returned with the wrench, the female driver, identified as Ramirez, thought he had a gun behind his back because she yelled, "[H]e has a nine, he has a nine." Sammy testified he threatened to shoot, but he only had a wrench.

---

[5] Jurors heard evidence that the victims' and the defendants' two families were acquainted with one another to some extent by virtue of seeing one another at school, at the bus stop, and around the neighborhood where Ramirez and Jeannette both lived. Jurors also heard evidence that there was some level of ill will related to bullying and stealing among the children. Sammy and Jeannette both testified that Ramirez and Vela had come to their house one time prior to the crime and accused their children of stealing a skateboard from Ramirez's children. Vela denied being present for any such confrontation and said he was in custody during that period of time, but he acknowledged hearing from Jeannette's children had stolen toys from Ramirez's yard.

[6] Sammy testified he was not and had never been in a gang, but he knew Vela was once he said "East Side." Vela also had a gang tattoo on his face. Given that the jury rejected the gang enhancement allegations, however, we do not further address the gang evidence in this case.

[7] Sammy testified it looked like a kitchen knife. On cross-examination, he denied telling an investigator he did not see the knife and, in later testimony, he clarified he was only able to see the tip of it.

Vela backed up after getting hit by Jeannette with the pole and Ramirez got out of the SUV. Ramirez told Sammy she was not going to do anything, and he told her this was not her fight; it was between him and Vela. Ramirez approached Jeannette and they had a conversation, but Sammy did not see them begin to argue because, at that point, Ramirez's teenage son, Noel, also got out of the SUV. Sammy took the wrench out from behind his back and squared off with Noel, who got scared and ran to the other side of the SUV. Sammy turned and saw Vela and Ramirez jumping Jeannette. He testified Jeannette no longer had the pole and was curled up in a ball with her jacket over her head. Vela and Ramirez were stomping her with their feet. Sammy did not remember if he dropped or threw the wrench, but he got rid of it at that point and did not pick it up again during the confrontation.

Sammy went up to Ramirez, grabbed her by the hair and threw her off Jeannette. Sammy then hovered over Jeannette to protect her. Vela approached Sammy from behind and sliced his back open with a blade. It felt like a punch and Sammy did not initially realize he had been sliced. Vela then sliced Sammy's stomach open and cut his side.

Sammy testified he and Vela began exchanging blows again. Sammy grabbed Vela's hand with the knife in it, dropped to his knees and held on. Vela then slashed Sammy's neck open with a second weapon. After Vela sliced Sammy, Jeannette's neighbor, Luis, came over, and he and Vela also exchanged blows. Luis was not armed with a weapon and, after Vela started slashing with his knife, Luis ran around the SUV to get away. Luis's fiancée, T., said she was calling the police, at which time Vela and Ramirez returned to their SUV and drove off.

After Vela and Ramirez left, Sammy saw Jeannette's head was "busted open" and there was a lot of blood. He did not see who inflicted the injury, though. Luis told Sammy he was bleeding a lot and when Sammy returned to his porch, he saw his stomach cut open. He testified he gave a statement to police after they arrived, but he started seeing black dots and felt himself "lifting from [his] body." The paramedics' voices were echoing and then everything went blank. Sammy subsequently underwent surgery and was hospitalized for approximately three days. He testified he experienced severe pain, and had difficulty turning his neck and moving. He also testified that, at the age of 22, he was still not the same as he was before the attack.

Sammy testified he did not see any injuries to Vela or Ramirez and he did not see anyone hit Ramirez. He also testified he did not pick the wrench up again after he discarded it, and he never swung at anyone or hit anyone with it. He denied he or Jeannette ever hit Ramirez's SUV with their weapons. When shown photos of steak knives on the ground, Sammy denied they were his, and after initially identifying the wrench and pipe in photographs, Sammy denied the photos were of the wrench and pipe he and Jeannette had that night.

### 2. Jeannette

After Ramirez stopped her vehicle in front of the house and Sammy said to slow down because they almost hit the kids, Vela accused them of having a laser. Jeannette heard something to the effect of, "F you and your kids." Sammy and Vela exchanged words and Vela said he was from the East Side. Sammy said something like, "I don't bang, but [I'll] still beat your ass."

///

4

1
2
3

Jeannette recalled having a heated conversation with Ramirez, but testified she did not get physical with anyone in the SUV. She also recalled banging a thin black stick or pole on the ground to scare Vela and Ramirez away prior to being injured, and she recalled hitting Vela in the stomach once when he approached her. She testified that neither she nor Sammy hit Ramirez's SUV with the pole.

4
5
6
7

Jeannette also recalled hearing Ramirez say, "[T]hrow the bike at the bitch...." Jeannette testified someone pulled her hood over her head; she did not know who, but only Ramirez and Ramirez's son were nearby. She was then hit in the head while she was on the ground in a fetal position covering her head with her hands. She also heard someone say to stop and, at some point, someone helped her back to her house, where her wounds were wrapped. Jeannette testified she was unable to see anything until later that day at the hospital.

8
9
10

More than 100 stitches were required to close Jeannette's wounds, and she had surgery on her right hand. She was unable to open that hand or bend it, and she was unable to use her right hand or arm for approximately four or five months. At the time of trial, which was approximately eight months after the crime, she was unable to make a full fist with her right hand and, at times, the injury affected her ability to complete everyday tasks.

11
12
13
14

On cross-examination, Jeannette denied the steak knives on the ground in the yard were hers and she denied telling Sammy to get a knife. She recalled Sammy saying "something about a nine," but testified he did not threaten to shoot anyone and he does not have a gun. She also testified she did not see Sammy with a weapon.

15

### 3. Neighbors Luis and T.

16

#### a. Luis

17
18
19
20
21

Luis and his fiancée, T., lived across the street from Jeannette. They were just returning home from the fairgrounds with their children and Luis's sister when they saw the altercation between Sammy and Vela. Luis testified that as he pulled his car into the driveway, he saw a vehicle parked in the middle of the street and Sammy and Vela arguing.[8] They both looked angry and were cursing. Luis heard Vela say, "East Side," and the two men began exchanging blows, but Luis did not see any weapons. Vela then pulled a silver folding knife from his pants pocket, chased Sammy, and sliced Sammy down his ear, along his neck, twice in the back, and once along his gut. Luis testified the slash wounds were deep and were inflicted while Sammy was on the ground and without a weapon.

22
23
24
25

Luis testified that the events unfolded very quickly. He was unsure of the precise timing of everything, but he saw Ramirez and Jeannette wrestling prior to when Vela drew a knife. After Vela pulled the knife, Luis saw Ramirez put Jeannette in a headlock, which Luis freed her from. Ramirez then obtained a wrench from the ground and struck Jeannette once hard between the eyes. Luis testified that Jeannette was not attacking Ramirez when she was struck with the wrench and after striking Jeannette, Ramirez returned to her SUV.

26
27

Luis then saw Vela slashing Sammy. Jeannette ran over to help Sammy and Vela turned the knife on her. Luis testified he saw Jeannette, who was unarmed and down on the ground, trying to hit Vela. Jeannette was covering her face with her

28

---

[8] Luis did not know Vela.

arm, and Vela sliced her on the hand and inside of her arm. Luis described Sammy and Jeannette as both squirming on the ground trying to avoid Vela's knife.

Luis testified that when Vela pulled a knife, he knew Sammy needed help and he tried to help by pushing Vela off, but Vela turned on him and he ran. Vela then got back in Ramirez's SUV and they left.[9] Luis subsequently heard Jeannette say, "[M]y eyes, my eyes, I can't see anything."

Luis testified he did not see Sammy or Jeannette with any weapons that night, he did not see anyone banging on Ramirez's SUV, he only saw Vela with one knife, and he did not see injuries on Vela or Ramirez. He also did not see Sammy enter the house, did not hear Sammy tell Jeannette to get a knife or threaten to shoot anyone, and did not hear anyone say Sammy had a gun. Luis denied telling law enforcement that he did not see Ramirez with a wrench; that he did not see Vela come at him with a knife; that it was his sister, not he, who saw the knife; or that T. saw most of the fight and had a better observation of it than he did. Luis also testified that Jeannette did not have anything covering her head.

### b. T.

T. testified that when they returned home from the fairgrounds, she saw a lot of commotion in the street and heard yelling. Luis got out of their car first and, after telling the children to stay in the car, T. got out, locked the car and walked to the end of her driveway. She saw Jeannette's oldest daughter standing around crying and Jennette curled up in a ball with Ramirez on her knees in front of Jeannette and Vela over Jeannette. T. testified she could not see if Ramirez's fists were landing on Jeannette, but Ramirez was moving like she was hitting Jeannette and Jeannette was screaming. It also looked like Vela was hitting Jeannette repeatedly.

T. saw Sammy's and Jeannette's boys moving around, but she did not see Sammy. Luis ran up and pushed Ramirez off Jeannette, which sent Ramirez into the street near T. T. testified she put her hands up to signal she was not going to fight Ramirez. T. did not know if Ramirez had the metal tool before Luis pushed her, but T. heard the sound of metal on pavement and saw Ramirez grab what looked like a socket wrench from the ground. Ramirez then ran over and hit Jeannette in the face with the metal tool like she was hitting a baseball. Jeannette did not have a weapon and her hands were clenched over her face. After striking Jeannette, Ramirez grabbed her little boy, who was standing there crying, and got back in her SUV.

Luis then pushed Vela again and Vela let go of Jeannette's body; T. could see Jeannette drop. Vela chased Luis and then returned to the SUV, after which Ramirez peeled out and left. While Vela was chasing Luis, T. saw Sammy standing near his porch, bloody. She testified she could see his wounds from across the street, which she described as "open chunks of pink," and she thought, "[H]ow are you standing?"

Jeannette was completely covered in blood and there was so much blood on her face that T. could not see it. She had wide slices to her forearms. T. took Jeannette's oldest daughter to her own home and went inside to tell her babysitter

---

[9] Luis called 911 after Vela and Ramirez left.

and Luis's mother that they needed help. T., Luis and Luis's mother then tended to Sammy's and Jeannette's wounds with towels and sheets.

T. did not see any injuries on Vela or Ramirez and she testified Ramirez "looked like a fierce, crazed animal." She did not see any blood on Ramirez, but Vela had "a good amount [of blood] on ... his arms," which had been around Jeannette when she was bleeding. T. did not see a knife or anyone hitting Ramirez's SUV.

### 4. Jeannette's Children

#### a. De.

Jeannette's sons, De. and Di., were outside playing football in the street with other children when Ramirez drove down the street fast and stopped short of them. De., who was 12 years old at the time of the crime, testified that Sammy told the occupants not to go too fast. Vela got out, yelled about pointing lasers and said something about "East Side Bakers." He then hit Sammy in the face. Sammy got mad and the two began trading punches.

De. testified that Ramirez got out of the SUV and tried to jump in and hit Sammy. Jeannette said something about letting the fight be fair. Ramirez subsequently tackled Jeannette from behind and pulled her hood over her face so she could not see. Vela then ran over and stabbed Jeannette, who was on the ground. De. said he saw blood everywhere and he saw Sammy trying to help Jeannette off the ground. De. testified Luis came over and tried to help. He saw Luis try to push Vela and Vela chase Luis.

De. stated he did not see the end of the fight because he went inside the house. After the fight was over, he saw Sammy's back and stomach were cut open. He did not see any injuries on Vela or Ramirez.

De. testified he did not see a knife. He subsequently testified he remembered telling the police he saw Vela with a knife but, at trial, he could not remember seeing Vela with a knife. He testified Vela was trying to stab Sammy, however. He also testified Sammy retrieved a wrench from the garage and had it behind his back to scare Vela and Ramirez, and he did not hit anyone with it, although he tried to hit Vela with it. De. did not see Jeannette or Luis with a weapon.

On cross-examination, De. testified the knives that were found in the grass belonged to Jeannette. He testified he did not know if Sammy hit anyone with the wrench and he did not hear Sammy threaten to shoot anyone.

#### b. Di.

De.'s younger brother, Di., testified that after the SUV stopped and Vela got out, Sammy stated the SUV almost hit the children. Vela accused them of using a laser and asked Sammy if he was from a gang. Sammy responded "no" and they began arguing. Both men threw up their fists and then Sammy started walking away. Vela hit Sammy, after which Sammy took off his shirt and the two started the first of their two fights, using their fists.

After Sammy and Vela stopped fighting, Di. saw Sammy raise his hands when Noel got out of the SUV, but Sammy did not engage in a fight with Noel.

///

7

Di. testified Sammy brought out a wrench from the garage and held it behind his back to scare Vela and Ramirez away. Ramirez thought it was a gun and Sammy played along, but Di. did not hear him threaten to shoot anyone. Di. saw the tip of what looked like a knife in Vela's hand, and he saw Vela swinging his knife but did not see him cut anyone with it.

Di. saw Jeannette on the ground curled up with her jacket over her head, but he did not see how she got there. Vela and Ramirez were by Jeannette and were hitting her. Sammy went over, got Vela and Ramirez off Jeannette, and covered her with his arms. Di. also saw Luis come over and then run, and he heard T. say she was going to call the police. Vela and Ramirez then left.

After the fight ended, Di. saw that Jeannette's head was injured and he saw Sammy's injuries but did not see how they occurred.

Di. did not see Sammy hit Ramirez's SUV with a wrench or Jeannette hit it with a pole, and the vehicle was not hit by him, his brothers or his friends. He also did not see Jeannette with a pole. On cross-examination, Di. identified the steak knives on the ground as belonging to Jeannette. He testified that Sammy had the knives outside where he was repairing their bicycles and he used them to cut the inner tubes.

### B. Ramirez's Statement to Law Enforcement

Ramirez was arrested two days after the incident and an audio of her statement to police, which was video recorded, was played for the jury. Ramirez told officers that the altercation occurred as she, Vela and her children were on their way home from the park and their dog jumped out of the car window. She said she had previously confronted Sammy and Jeannette about their children stealing toys from her backyard, and told officers, "[W]e already don't like each other, so they know who we are." After her family's dog jumped out of the window and they followed it, a verbal confrontation between the parties occurred and it escalated into a physical fight after Sammy hit Vela in the face.

At some point, Sammy said he had a gun and Jeannette appeared with a crowbar as the men were fighting. Ramirez warned Jeannette against hitting Vela with the crowbar, but then backed off because she was scared of the crowbar.

Jeannette then started hitting Vela with the crowbar. Ramirez said she told the kids to get the dog and get in the SUV. Vela also got in the SUV, but Ramirez said, "[T]hey wouldn't let us leave." She stated that Sammy and Jeannette both hit Vela multiple times, and it felt like it went on forever. She also said that Jeannette hit Vela in the head with the crowbar, which Ramirez described as the length of the interview table, multiple times for 20 to 30 minutes.

Ramirez stated Jeannette would not let her get back in the SUV and Vela, who was by then back in the car, got out again. Ramirez said that Sammy went to the garage, returned with a wrench and would not stop hitting Vela with it, and that "they," including a neighbor in a Pendleton shirt, were beating Vela nonstop. Ramirez said Jeannette's children had weapons, too, and were hitting Vela.

Ramirez said she got the crowbar away from Jeannette, threw it on the ground and "started socking [Jeannette] [¶] ... [¶] ... in [the] face." Sammy came over and started hitting Ramirez in the back with the wrench. She told officers her back and the back of her head hurt, but she had not looked at them in the mirror. Noel then

got out of the SUV, took the wrench away from Sammy, threw it and started helping Ramirez. Ramirez said that after Vela helped Noel out, they were finally able to leave.

Ramirez said her neighbor asked her what happened and said he heard she had stabbed some other neighbors, which she denied. Ramirez told the officers no one was stabbed, she denied she or Vela had any weapons, and she said it was the others who had the weapons. She also said the only blood she saw was on Vela.

Photographs taken of Ramirez the day of her arrest depict a bruise on her right tricep, a bruise on the left side of her back, and some red marks on her back. Jurors also saw an out of focus photograph that the parties stipulated was of Ramirez's leg; the photo appears to show a mark.

### C. Law Enforcement Testimony

When officers arrived, Sammy and Jeannette were covered in blood and appeared to be severely injured. Officers spoke with them briefly at the scene but did not take full, complete statements at that time.

Sammy had a laceration from mid-ear to his collar bone on the left side and his earlobe was split in two. He also had deep lacerations on his back and a deep laceration from his ribcage around to his stomach. Officer Ferguson, who took Sammy's statement, described him as cooperative but lethargic, in and out of lucidity, and having difficulty breathing given his injuries.

Jeannette had a laceration, or slicing injury, near her left elbow, an injury to her right arm, and an injury to her forehead above her eyebrows. She was actively bleeding and Officer Peck, who took her statement, described her as distraught over her injuries and in pain.

At the scene, police located three steak knives in the yard and a wrench. They did not locate a laser or a crowbar.

The evening of the crime, Vela went to the hospital. Photographs taken of him show a cut on his head above his left eyebrow. He stated at the time that he was playing basketball and knocked heads with someone else.

### II. Defense Case—Ramirez

### A. Ramirez's Children

Ramirez and Vela had been romantically involved in the past and had a six-year-old daughter, but they were no longer together. At the time of the crime, Ramirez had a restraining order against Vela, but he called that day and wanted to see his daughter, so Ramirez, their daughter and her four older children met at the park for the afternoon. On their way home from the park, someone pointed a red laser inside the SUV Ramirez was driving. The beam hit Ramirez and moved around the SUV. She stopped her SUV in the street and their dog jumped out through an open window.

### 1. Angelica

Ramirez's 14-year-old daughter, Angelica, testified that Ramirez drove down Jeannette's street, where the laser beam was coming from, to get their dog back.

Sammy was standing in the front yard by himself and there was no one else outside. Ramirez parked her SUV in the street, got out and confronted Sammy about the laser. Sammy yelled at Ramirez, so Vela got out of the SUV and told him not to talk to her that way. Sammy and Vela started yelling and cussing at each other. Angelica testified Sammy said, "[T]his is westside," and he was a "Crip." Vela said, "Eastside Bakers." Sammy punched Vela, who hit him back.

Jeannette and her children then came out of the house and, at some point, Angelica heard Sammy tell the kids to go get a gun. When she came out, Jeannette had a metal stick in her hand that looked like a crowbar and she started hitting Vela with it, although Angelica did not remember where she hit him or how many times. Sammy broke away from the fight, went into his garage and returned with a large wrench. Ramirez, who did not have a weapon, got out of the SUV to stop Jeannette from hitting Vela, and Sammy grabbed her arm hard and hit her a couple of times on her back with the wrench, knocking her down. Angelica's brother, Noel, then got out of the SUV to pull Sammy away from Ramirez. Sammy threw the wrench at Noel, but it missed and landed in the street.

After Sammy pushed Ramirez to the ground, Vela returned to the SUV and put his wallet, phone and Chapstick on the front seat. At that time, he was not injured. Angelica testified that Sammy and Jeannette were double-teaming Ramirez. Sammy hit Vela in the head with the wrench first and Vela subsequently slashed Sammy in the back. Angelica did not see a knife or anything in Vela's hands, but she saw his hand movements, blood and the injury to Sammy's back.[10] While Sammy and Vela were fighting, Jeannette and Ramirez were fighting separately in the street.

At the end of the fight, Sammy was on Ramirez and Vela was on Sammy. A neighbor intervened and pulled Sammy off Ramirez and away from Vela, which allowed Ramirez and Vela to leave. After dropping their dog off at home, Ramirez dropped Vela off somewhere.

Angelica did not remember anyone hitting Jeannette with a wrench or weapon and she did not see Ramirez with the wrench that day, but she said Ramirez hit Jeannette with her fists when they were engaged in a fight. Angelica testified she did not see Jeannette curled up on the ground or with injuries, although she saw Jeannette holding her head. She also did not see Vela chase the neighbor. She acknowledged telling an investigator that she was trying to watch the fight and get their dog in the SUV at the same time, and that she saw most of the fight from the backseat of the SUV.

Angelica testified that when she later told Ramirez about the cuts on Sammy's back, Ramirez was unaware of them and was surprised.

Photographs of Ramirez's SUV showing dents in it were taken by Ramirez's mother several days after the fight. Angelica testified that the SUV did not have any dents in it before the fight, but she did not remember anyone hitting the SUV during the fight and she did not notice any dents in it until the day her grandmother took the photos.

///

---

[10] Angelica also subsequently testified that Sammy hit Vela in the head with the wrench before throwing it at Noel. She testified without equivocation that after Sammy threw the wrench at Noel, no one picked it up again.

1

## 2. Noel

2    Ramirez's son, Noel, who had just turned 15 years old when the crime occurred,
3    testified that after Ramirez stopped her SUV because of the laser beam, the dog
     jumped out of the window. Ramirez said something to Sammy about the laser and
4    he responded angrily. Vela got out and started fighting with Sammy. Noel
     testified he saw Sammy throwing gang signs and calling Vela names, and that he
5    was sure Sammy said "Westside," but he was also "pretty sure" Sammy said,
     "Westside Crips." Vela told Sammy to calm down, Sammy punched him and the
6    two started fighting.

7    After a few minutes, Jeannette came over with a large metal bar and started
     hitting Vela with it. When Jeannette began hitting Vela, Ramirez, who had been
8    in the SUV telling Vela to get back in, got out and tried to pull Vela out of the
     fight. Jeannette hit Ramirez in the back with the bar and the two began fighting.
9    Noel also testified that some of Jeannette's children were involved in the fight
     and, on cross-examination, Noel testified they had weapons as well and when
10   Jeannette was fighting with Ramirez, the children hit Vela.

11   Sammy went back to the house, returned with a large wrench and hit Ramirez in
     the back of the head, the ribs and the back while she was down on the ground. He
12   also hit her with his fists. At that point, Vela was fighting with two tall, white or
     light-skinned men who came from across the street. On cross-examination, Noel
13   testified that, at times, the two men and Sammy were fighting with Vela and had
     him on the ground, and the two men were hitting Ramirez as she was fighting
14   Jeannette. Noel did not see Vela do anything to Sammy or get a weapon from the
     SUV.

15   Noel got out of the SUV when Sammy and Jeannette were hitting Ramirez. Noel
     testified he pulled Sammy off Ramirez and Sammy threw the wrench at him but
16   missed. Noel tossed the wrench aside and he and Sammy began hitting each other.
     Vela then ran over, pulled Sammy off Noel and began fighting with Sammy.
17   Ramirez and Jeannette were also still fighting. Ramirez finally said it was too
     much and they should go. The three of them then headed back to the SUV. Vela
18   was bleeding from the head. The two men who were fighting with Vela ran up
     and tried to get at them inside the SUV, but Ramirez was able to drive off. After
19   dropping their dog off at home, Ramirez dropped Vela off near a hospital.

20   Noel testified he never saw Ramirez with a weapon in her hand or Vela with a
     knife, and he did not see anyone hit Jeannette with a weapon. He also did not see
21   Jeannette lying on the ground and did not see any injuries on her or on Sammy.
     He testified he saw Vela pull Jeannette off Ramirez but did not see Vela strike
22   Jeannette.

23   Noel testified that prior to the fight, Ramirez's SUV did not have any damage to
     it. When Noel looked at it less than a week later, it had dents in it.
24

## 3. Ruben
25

26   Ramirez's son, Ruben, was 10 years old when the crime happened and at the time
     of trial. He testified that after someone shined a laser in Ramirez's eyes and
     Vela's face, Vela got out of the SUV first. Vela was talking to Sammy, who was
27   yelling he did not point a laser. Ruben did not have a detailed memory of the fight
     but said that Vela then fought with Sammy and Ramirez helped Vela when he was
28   being hit in the head with a crowbar by Jeannette. Ruben testified Ramirez did not

have a weapon and she helped by pulling Jeannette off Vela. Ruben did not see Vela with a weapon, but he was "pretty sure" Vela went back to the SUV, got something and returned to the fight. Ruben testified Sammy had a wrench and he hit Ramirez with it in the ribs and back. He did not remember if anyone said anything about a gun, and he did not remember what Jeannette was doing when Sammy was hitting Ramirez.

Ruben got out of the SUV to help his brothers catch their dog and, after they put the dog back in the SUV, he stayed outside and tried to stop the fight. Ruben testified he yelled something, but then got back inside because no one was listening, and his younger sister was crying. He testified Ramirez got back in the SUV first. Vela followed and his head was bleeding a lot.

Ruben also testified that when he was inside the SUV, an African-American man other than Sammy took the crowbar from Jeannette and hit the side of the SUV with it.

### B. Other Evidence

#### 1. Law Enforcement Testimony

##### a. Officer Aquino

Ramirez called three officers with the Bakersfield Police Department to testify. Officer Aquino responded to the scene of the fight and interviewed Jeannette's sons, De. and Di., separately. Aquino testified that De. did not tell him anything about the knives in the front yard and did not mention Sammy using them to work on bicycles. De. said his father got in a fight with Vela and his parents were stabbed, but he did not say anything about them having weapons.

Di. told Aquino that Vela was swerving as he drove down the street and the fight started after Sammy yelled at Vela for the way he was driving. Vela challenged Sammy to a fight and yelled, "Eastside." Sammy said he did not "gang bang."

Di. stated that the fight involved a knife and a wrench, and that his father was stabbed. Di. did not say Sammy had a wrench during the fight or threaten to shoot anyone and, although he said his mother was also involved, he did not say Jeannette had her hood pulled over her head, did not say she had a weapon, did not say any of the knives belonged to her, and did not say anything about a metal pipe or crowbar. Di. stated Vela retrieved a knife from the SUV after Sammy fell to the ground and Ramirez hit Jeannette with a wrench. He did not say anything about Sammy running into the house or Jeannette hitting Vela with a metal pipe or bar. Di. also did not mention a neighbor being involved or Vela chasing a neighbor with a knife.

##### b. Officer Ferguson

Officer Ferguson testified that when he interviewed Sammy, Sammy did not mention he threatened anyone with a gun or led anyone to believe he had a gun, and he did not mention anyone saying he had a gun. He also did not mention that he or Jeannette had any weapons, that Jeannette told him to get the knives, or that Jeannette hit Vela with a metal bar or pole. Sammy told Ferguson that he and Jeannette had both been stabbed and that Vela pulled a knife from his pocket.

///

### c. Officer Galdamez

Officer Galdamez interviewed Luis, who described Vela and Ramirez as the suspects and pointed out Sammy and Jeannette, who were then receiving medical treatment at the scene, as the victims. Luis did not say anything about being involved in the fight. He mentioned Ramirez had Jeannette in a headlock, but he did not say he freed Jeannette from it. He also mentioned a "[s]ilver blade knife" was involved.

## 2. Character Witness

Ramirez also called Maria C. to testify. Maria, through her church's women's ministry, volunteered as a counselor mentoring single mothers. Maria had known Ramirez for approximately three years and more closely for the 11 months that preceded the crime. She testified Ramirez was a caring, truthful, nonviolent person, and she had never seen Ramirez display a temper. She also testified she was surprised to learn Ramirez was with Vela that day, because they had a rocky relationship, they were no longer together, and Ramirez was not interested in rekindling the relationship.

## III. Defense Case—Vela

### A. Rosa and Ededina

#### 1. Rosa

Vela called Rosa and her mother, Ededina, to testify. They lived near Jeannette and were on their way to the mall when they saw the fight. Rosa called 911 and told the dispatcher that people were hitting each other and destroying a car. She stated that the person who fled was African-American, and that the one man causing the problems and hitting the other car was in front of a house, which, by the address given, was Jeannette's house.

At trial, Rosa did not recognize Vela or Ramirez. She testified that an African-American male, whom she identified as Sammy from a photograph and described as "out of control," was violently hitting a white SUV with a wrench, including the windows, and she noticed crying children around the car.[11] She said there were white-complexioned women and one African-American woman around the car, and some neighbors were outside watching. Rosa said the white-complexioned people were trying to protect their children and get into the SUV but were not able to because Sammy was hitting the vehicle. Rosa heard cussing and said the African-American woman was injured, holding her head, and crying, but Rosa did not see an injury to her head. Rosa testified Sammy stopped hitting the car and dragged the woman forcefully into the house by her injured arm. The woman was saying, "Please don't, not anymore. Not anymore." The SUV then took off and Rosa saw Sammy outside making a telephone call.

Rosa testified that Sammy had an injury to his forehead and she did not recall if the light complexioned people had any injuries. She clarified that the light-complexioned people left in the SUV and the African-American man she referred to in her 911 call was her neighbor, whom she identified from the photograph as Sammy. Rosa recalled telling an investigator that she thought the man was hitting the SUV with a baseball bat, but she testified he had a wrench.

---

[11] Ramirez drove a blue Kia SUV.

On cross-examination by Ramirez's counsel, Rosa testified that she did not see Sammy hit the woman he was dragging with a wrench and she did not see the people in the SUV with any weapons.

During cross-examination by the prosecutor, Rosa testified that Sammy was hitting the SUV, which she again described as white, everywhere with the wrench, and that she heard the sound of glass breaking. She described the scene as chaotic and "very violent," but she did not see anyone hitting anyone else and she did not see how anyone was injured. The prosecutor showed Rosa the photograph from which she identified Sammy, which does not depict any injury to his forehead, and she again stated that she saw Sammy bleeding from his forehead. She described the African-American woman as having an injured arm, although she did not recall seeing any blood, and she denied the woman she saw had any injury to her head.

On recross-examination, Ramirez's counsel showed Rosa a photograph depicting an injury to Jeannette's forehead. Rosa stated she did not recognize the person in the photograph, although she thought, but was not sure, that the injury depicted was in roughly the same location as the person she saw who had a forehead injury. She testified she was sure that the person hitting the car and dragging the woman was the person she saw with the forehead injury. Rosa also identified Ramirez's blue SUV from photographs as the vehicle she saw being hit, and she stated again that the person hit the SUV all over, including the windshield.

On recross-examination by the prosecutor, Rosa was shown a photograph of Vela, who was bald and had a gash in his forehead above his left eyebrow. Rosa testified that she could not tell what kind of wound the person she saw had, but he was bleeding from his forehead and he had hair.[12]

### 2. Ededina

Ededina, like Rosa, stated she did not recognize Vela or Ramirez. She testified that when she and Rosa were leaving for the mall, she heard "horrible" yelling and screaming, and saw a big fight. She initially testified she did not see any weapons, but then recalled seeing someone hit a vehicle with a large wrench and seeing an African-American man come out of a house with a knife. She also saw an African-American woman with "blows to her arm," but did not see how they were inflicted. She recalled telling an investigator that she saw the man go into a house, retrieve a knife and get into a fight with a light-skinned man, but she said she did not pay close attention due to the confusion and the arrival of police.

### B. Vela

Finally, Vela testified that at the time of the crime, he had recently been released from the California Department of Corrections and was living with a relative. He was not supposed to have any contact with Ramirez, but he called her because he wanted to see their daughter. Ramirez dropped Vela, their daughter and the dog off at the park. After Ramirez and her other four children, whom Vela helped raise and considered to be his, went to church, they joined him at the park for the afternoon. Toward the end of the day, they all squeezed into Ramirez's SUV. Vela was in the front passenger seat and Ramirez planned to drop him off at his relative's house.

---

[12] The photographs of Sammy taken at the scene show he had hair.

As Ramirez was driving, she hit the brake suddenly, which scared everyone. Vela then saw the laser beam moving around and hitting them in the face. He could see it was coming from the middle of Townsley Avenue. Ramirez, who was upset, turned down Townsley and honked at the children playing in the street so they would get out of the way. She made a U-turn and stopped in the middle of the street in front of the house identified by address as Jeannette's.

When they pulled up, Vela saw Sammy put the laser in his pocket and he was confrontational when he approached the SUV. He denied having a laser and started cussing and calling Ramirez names. Vela then got out of the SUV to talk to Sammy and calm him down. When Vela confronted Sammy about having the laser in his pocket, Sammy threatened to whip him, and Sammy hit him in the face. Sammy then backed up to remove his shirt.

Sammy and Vela started swinging at each other as Jeannette egged Sammy on. Vela testified that approximately three times, Sammy stopped, Vela turned to walk back to the SUV, and Sammy then ran up behind him and hit him, connecting with the back of his head several times. As Vela ran toward the SUV, Jeannette was standing in front of it hitting it with a pipe. Jeannette stopped when she saw Vela. Ramirez was out of the SUV by then, along with Angelica, and they were all yelling. As Vela reached the vehicle and opened the door, Sammy ran into the house. Vela told everyone to get back in the SUV, which they did. The dog jumped out, however, and Vela told Noel to get the dog, reasoning that Sammy would not attack a 14-year-old.

Noel was outside the SUV when Sammy came back out of the house. Vela heard Jeannette scream, "Oh my, God. He's got his gun," which Vela perceived as a concerned warning rather than a threat. Ramirez said, "Did you hear he got his gun?" and, "[L]et's go." As Noel tried to grab the dog, Sammy came running up and started swinging at Noel, hitting him several times. As Ramirez was getting out of the SUV, Sammy threatened to shoot them. His hand was behind his back.

Sammy grabbed Ramirez by her hair, pulled her head down and started hitting her as he dragged her approximately 15 feet. Jeannette started hitting Ramirez with the pipe. As Vela got out of the SUV and was walking around it, Noel was screaming at him to help Ramirez. Vela told Noel to grab the dog and stay in the SUV. Vela headed toward Ramirez and Luis came running from across the street with his hands up. Vela chased Luis off and went over to where Ramirez was down on the ground. Vela testified Ramirez and Jeannette were "locked up with their hair." He freed Ramirez as Sammy hit him, and Jeannette then hit him in the head with the pipe above his left eye, causing him to black out momentarily. Vela fell to the ground and he testified he could barely see because of the blood dripping down his face. Sammy and Jeannette, who were both armed with weapons, were hitting him in the back and the head.

Vela testified that he had a boxcutter, or double duck knife, in his pocket for his work in air conditioning installation and repair, and, at that point, he grabbed it out of his pocket and started swinging. He recalled hitting Sammy once and Sammy falling on him, but he said the blow with the knife did not faze Sammy. Sammy and Jeannette continued to hit Vela, and, at some point, Sammy slipped and fell, which tripped Vela up. Vela testified he believed the injuries to Sammy's back may have occurred when Sammy fell and they fought on the ground. Vela also testified Sammy had a wrench and a gun, and he just wanted to survive and get out of there.

Sammy and Jeannette stopped hitting Vela and, as he got up, Luis was kicking him. Luis then ran. Vela denied ever swinging his knife at Luis and, after he got up, he ran to Ramirez's SUV. Vela stated Luis then ran toward their vehicle, but they took off. Vela said he heard something hit the ground and thought Luis might have thrown something.

After Ramirez dropped the dog off at her house, she dropped Vela off at his relative's house because he wanted to get his insurance card before going to the hospital. Vela testified that he had a golf ball size lump on his head under the gash, which was not visible in the photographs taken, and he received stitches. He acknowledged that he stated he fell down playing basketball, he did not tell police he acted in self-defense and he requested a lawyer.

During cross-examination by Ramirez's counsel, Vela testified he did not see the injury to Jeannette's forehead, he did not know who caused the injury, he did not see Ramirez with a weapon and he did not see Ramirez hit Jeannette. He also testified Jeannette did not have the injury to her forehead before he took the knife out of his pocket and he did not get a good look at her after he took the knife out.

During cross-examination by the prosecutor, Vela denied saying or yelling "Eastside Bakers," but stated Sammy said, "Westside." He testified that during the initial confrontation with Sammy, he could smell alcohol on Sammy's breath. He also testified that when Sammy came out of the house, he had a wrench in his back pocket. After Sammy grabbed Ramirez by her hair, he hit her repeatedly in the face as he was dragging her. Vela estimated Sammy hit Ramirez hard around 20 times while Jeannette hit Ramirez in the back with the pipe around 10 times.

After Vela freed Ramirez, Vela cut Sammy once but Sammy kept swinging with full force. Sammy then swung with the wrench and missed because he slipped on the grass. Vela testified that before Sammy slipped on the grass, he hit Vela a couple of times with the wrench in the shoulder area. Vela did not see Jeannette with a weapon other than the metal pipe and did not see Sammy with a knife or a pipe. Ramirez did not have any weapon and he only had a boxcutter. Vela did not remember hitting Sammy in the head with the boxcutter and said he was swinging it everywhere. He denied he and Ramirez attacked Jeannette together or that he ever hit Jeannette, and he stated that it was Ramirez, not Jeannette, who was curled up in a fetal position. When Sammy fell on the grass, Vela was over him, but Vela denied Jeannette was underneath them. He denied Ramirez ever hit Jeannette with a wrench, as Luis and T. had testified. He also denied blacking out when he was hit. He explained he saw a flash of light when he was hit and he fell to the ground.

He testified that although the officer at the hospital was in uniform, he told her he hurt his head playing basketball because she was working at the hospital and he did not think it was any of her business what happened. He testified his other injuries were not visible in the photographs, as the photos were taken for the purpose of documenting his tattoos.

<u>Vela</u>, 2019 WL 457665, at *2–14 (footnotes in original).

///

///

///

16

**III.**

**STANDARD OF REVIEW**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

1   decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that
2   'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent
3   decisions"; otherwise, there is no clearly established Federal law for purposes of review under
4   AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,
5   754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125,
6   123 (2008)).

7         If the Court determines there is clearly established Federal law governing the issue, the
8   Court then must consider whether the state court's decision was "contrary to, or involved an
9   unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A
10  state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at
11  a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state
12  court decides a case differently than [the Supreme Court] has on a set of materially
13  indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an
14  unreasonable application of[] clearly established Federal law" if "there is no possibility
15  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme
16  Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state
17  court's ruling on the claim being presented in federal court was so lacking in justification that
18  there was an error well understood and comprehended in existing law beyond any possibility for
19  fairminded disagreement." Id. at 103.

20        If the Court determines that the state court decision was "contrary to, or involved an
21  unreasonable application of, clearly established Federal law," and the error is not structural,
22  habeas relief is nonetheless unavailable unless it is established that the error "had substantial and
23  injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)
24  (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776
25  (1946)).

26        AEDPA requires considerable deference to the state courts. Generally, federal courts
27  "look through" unexplained decisions and review "the last related state-court decision that does
28  provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

adopted the same reasoning." <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." <u>Id.</u>

"When a federal claim has been presented to a state court[,] the state court has denied relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. Where the state court reaches a decision on the merits and there is no reasoned lower-court opinion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not <em>de novo</em> review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

## IV.

## DISCUSSION

### A. Sufficiency of the Evidence

In his first claim for relief, Petitioner asserts that there was insufficient evidence to support the jury's finding that Petitioner harbored the required specific intent with respect to the aggravated mayhem counts. (ECF No. 20 at 5). Specifically, Petitioner argues that he was acting in defense and there is no substantial evidence to support the jury's finding that he had the specific intent to maim or disfigure either victim. (<u>Id.</u> at 5, 28). Respondent argues that rejecting a sufficiency of the evidence claim was reasonable. (ECF No. 25 at 11).

///

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in the petition for review in the California Supreme Court, which summarily denied the petition. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying the sufficiency of the evidence claim, the California Court of Appeal stated:

### 1. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio*, *supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) " '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....' " (*People v. Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.) However, "speculation, supposition and suspicion are patently insufficient to support an inference of fact." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268.)

### 2. Analysis

### a. Aggravated Mayhem

The aggravated mayhem statute provides, in relevant part: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, *intentionally causes permanent disability or disfigurement of another human being* or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill." (§ 205, italics added.) "[A]ggravated mayhem [is] a specific intent crime," which requires the prosecutor to prove "beyond a reasonable doubt 'that the defendant

acted with the specific intent to cause a maiming injury.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 86 (*Manibusan*); accord, *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831 (*Szadziewicz*).)

### b. Parties' Positions

Vela claims the jury's findings that he intended to disable or disfigure Sammy and Jeannette are not supported by substantial evidence. He contends "[t]he evidence show[s] ... that the attack was indiscriminate, random, or an explosion of violence." He points out that he did not wield a knife at the beginning of the fight, there is no evidence the knife "was a specialized knife particularly well-suited for causing lasting wounds," and Sammy and Jeannette were active participants in the fight. He also points out that "the intent to kill is not the same as the intent to maim."

The People respond that the location, symmetry and severity of Sammy's and Jeannette's injuries support the jury's finding that Vela had the specific intent to maim them. They contend the evidence shows that at the time they were injured, they did not present any threat to Vela, and, given the locations of their wounds, he was not indiscriminately slashing at them.

### c. Sufficient Evidence Supports Convictions

"A jury may not find specific intent 'solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately.' [Citation.] 'A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors.' [Citation.] '[E]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim." (*Szadziewicz, supra*, 161 Cal.App.4th at p. 831; accord, *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.)

Focusing on the photographic evidence and the testimony of Luis and T., the prosecutor argued that Vela's specific intent to main Sammy and Jeannette was inferable from the force used, the location of the wounds and his failure to stop slashing them until Luis intervened. We agree that the evidence supports the jury's finding as to Vela's specific intent. In this case, the timeworn expression that a picture is worth a thousand words is apt.

Turning first to the attack on Sammy, " '[a] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful.' " (*Szadziewicz, supra*, 161 Cal.App.4th at p. 833, quoting *People v. Ferrell* (1990) 218 Cal.App.3d 828, 833–834 (*Ferrell*).) More recently, the California Supreme Court concluded that the same fact that supports an inference of an intent to kill "can [also] support an inference of an intent to cause permanent disability or disfigurement." (*Manibusan, supra*, 58 Cal.4th at p. 88, citing *Ferrell, supra*, at p. 835.)

As the parties acknowledged in the trial court and on appeal, the jury in this case had to consider the testimony of 12 eyewitnesses and Ramirez's statement, all of which differed to one extent or another. However, Vela admitted slicing Sammy with a knife and the nature of Sammy's injuries was compelling evidence. Vela sliced open Sammy's back and side from his rear ribcage to his stomach with what Vela described as a double-sided knife. The resulting wounds were long,

deep and gaping. Vela also slashed Sammy down the side of the neck, slicing his earlobe in half. As Vela asserts, the fact that Sammy suffered horrific slashing injuries is not, alone, sufficient to prove he had the specific intent to maim Sammy (*Szadziewicz*, *supra*, 161 Cal.App.4th at p. 831), but a reasonable jury could have concluded from the evidence that, rather than stabbing Sammy randomly, Vela targeted Sammy's neck and torso with long and damaging slicing injuries in order to maim him. As courts have observed, " '[i]t takes no special expertise to know that [certain injuries], if not fatal, [are] highly likely to disable permanently.' " (*Manibusan*, *supra*, 58 Cal.4th at p. 88, quoting *Ferrell*, *supra*, 218 Cal.App.3d at p. 835.) While both *Manibusan* and *Ferrell* involved nonlethal gunshots to the head and to the neck, respectively, the principle articulated applies equally to long, deep knife wounds such as those inflicted here.

With respect to Jeannette's injuries, the knife wounds to her arms and hand are consistent with the evidence that she was down on the ground covering her head and face. The location of her wounds, and the testimony that she was curled in a ball protecting her head and face when they were incurred, supports a reasonable inference that Vela was targeting the area of her face and head with his knife. An attack that is limited in scope and targets a vulnerable part of the victim's body supports a reasonable inference that the attack was not indiscriminate. (*Manibusan*, *supra*, 58 Cal.4th at p. 88; *People v. Park* (2003) 112 Cal.App.4th 61, 69 (*Park*).)

As well, while a jury might have concluded that the slashings were the result of "an explosion of indiscriminate violence" that occurred in the midst of a melee between two couples (*Park*, *supra*, 112 Cal.App.4th at p. 70), the evidence did not compel that conclusion. To the contrary, although there was no evidence the knife attack was planned at the outset, the evidence showed a history of animosity between the couples. (*Id.* at p. 71.) In addition to the trial testimony relating to toy theft and bullying, Ramirez described to police an encounter that was tense from the start. She stated, "[W]e really don't like them because, um, her kids are always stealing my kids['] toys. They jump in my backyard," and later, "[W]e already don't like each other, so they know who we are." Although Vela denied he was present for the prior confrontation over a skateboard, the jury was not required to credit his testimony on that point and, regardless, he admitted he was aware of the situation involving Jeannette's children. Vela also chose to pull a knife midway through the fight, and the "deliberate choice of a steel weapon in lieu of 'fists-de-cuff' is ... evidence ... he had the specific intent to maim." (*Ibid.*) From these circumstances, the jury could have reasonably inferred that the brutal attack was motivated by Vela's desire to maim Sammy and Jeannette with his knife. (*Ibid.*)

Vela's contrary arguments—that the attack was indiscriminate; he did not have a knife at the outset; it was not a specialized knife suited to causing lasting wounds; the victims were active participants in the fight; the attack was not directed, controlled or aimed at a vulnerable part of the victims' bodies; and the absence of any evidence that he stopped the attack as soon as he realized that the victims were maimed—rely on viewing the evidence in the light most favorable to him, which is not the standard of review applicable to his claim.[13] (*Manibusan*, *supra*,

---

[13] In *Park*, the Court of Appeal observed, "It is particularly significant that [the] defendant stopped his attack once he had maimed [the victim's] face: he had accomplished his objective." (*Park*, *supra*, 112 Cal.App.4th at p. 69.) The presence or absence of that fact is not dispositive, however, and Vela does not claim to the contrary. (*Ibid.*; accord, *Szadziewicz*, *supra*, 161 Cal.App.4th at p. 831.) Nor do we find the fact that the defendant in *Szadziewicz* more methodically sliced up his victim's face, as Vela argues in his reply brief, of assistance. The factual distinctions

1    58 Cal.4th at p. 92; *Szadziewicz*, *supra*, 161 Cal.App.4th at p. 832; *Park*, *supra*,
2    112 Cal.App.4th at pp. 71–72.) "If the circumstances reasonably justify the trier
     of fact's findings, reversal of the judgment is not warranted simply because the
3    circumstances might also reasonably be reconciled with a contrary finding."
     (*People v. Albillar* (2010) 51 Cal.4th 47, 60; accord, *Manibusan*, *supra*, at p. 92;
4    *Park*, *supra*, at pp. 71–72.) Here, sufficient evidence supports the jury's finding
     that Vela specifically intended to main Sammy and Jeannette and, therefore, we
5    reject Vela's challenge to his convictions for aggravated mayhem.

6    Vela, 2019 WL 457665, at *14–16.

7          The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a

8    court must determine whether, viewing the evidence and the inferences to be drawn from it in the

9    light most favorable to the prosecution, any rational trier of fact could find the essential elements

10   of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A

11   reviewing court "faced with a record of historical facts that supports conflicting inferences must

12   presume—even if it does not affirmatively appear in the record—that the trier of fact resolved

13   any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State

14   law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of

15   evidence that the Due Process Clause requires to prove the offense is purely a matter of federal

16   law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

17         Jackson "makes clear that it is the responsibility of the jury—not the court—to decide

18   what conclusions should be drawn from evidence admitted at trial. A reviewing court may set

19   aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact

20   could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011). Moreover, when

21   AEDPA applies, "a federal court may not overturn a state court decision rejecting a sufficiency

22   of the evidence challenge simply because the federal court disagrees with the state court. The

23   federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

24   Cavazos, 565 U.S. at 2. Therefore, the Supreme Court has "made clear that Jackson claims face a

25   high bar in federal habeas proceedings because they are subject to two layers of judicial

26   deference." Coleman, 566 U.S. at 651.

27   between the two cases do not render Vela's convictions invalid for lack of sufficient evidence. The inquiry is " '
     "whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." ' "
28   (*Manibusan*, *supra*, 58 Cal.4th at p. 92.)

1    Here, the jury "had to consider the testimony of 12 eyewitnesses and Ramirez's

2    statement, all of which differed to one extent or another." Vela, 2019 WL 457665, at *15. In

3    light of the verdict, the jury clearly did not find Petitioner's version of events to be credible.

4    "[U]nder Jackson, the assessment of credibility of witnesses is generally beyond the scope of

5    review." Schlup v. Delo, 513 U.S. 298, 330 (1995). See Bruce v. Terhune, 376 F.3d 950, 957

6    (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under

7    Jackson."). Although it might have been possible to draw a different inference from the evidence

8    regarding whether Petitioner had an intent to maim or was attacking indiscriminately, the Court

9    "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution,

10   and must defer to that resolution." Jackson, 443 U.S. at 326. "[T]he only question under Jackson

11   is whether [the jury's] finding was so insupportable as to fall below the threshold of bare

12   rationality." Coleman, 566 U.S. at 656. Here, there was testimony that Petitioner pulled a knife

13   from his pants pocket, rushed at Sammy, and sliced deeply down Sammy's ear, along the neck,

14   twice in the back, and once in the gut while Sammy was on the ground unarmed. (4 RT 901–07).

15   There was also testimony that while Jeannette was curled up in a ball with her jacket over her

16   head on the ground, Petitioner was hitting her repeatedly and slicing her on the hand and inside

17   of her arm. (4 RT 908–10, 969–70). Therefore, the jury's finding did not fall below the threshold

18   of bare rationality.

19        Viewing the evidence and the inferences to be drawn from it in the light most favorable

20   to the prosecution, Jackson, 443 U.S. at 319, 326, and "applying the standards of Jackson with an

21   additional layer of [AEDPA] deference," Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005),

22   the Court finds the state court's denial of Petitioner's sufficiency of the evidence claim was not

23   contrary to, or an unreasonable application of, clearly established federal law, nor was it based

24   on an unreasonable determination of fact. The decision was not "so lacking in justification that

25   there was an error well understood and comprehended in existing law beyond any possibility for

26   fairminded disagreement." Richter, 562 U.S. at 103. See Boyer v. Belleque, 659 F.3d 957, 964

27   (9th Cir. 2011) ("[W]hen we assess a sufficiency of evidence challenge in the case of a state

28   prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a

1   double dose of deference that can rarely be surmounted."). Accordingly, Petitioner is not entitled

2   to habeas relief on his first claim, and it should be denied.

3       **B. Ineffective Assistance of Counsel**

4       In his second and third claims for relief, Petitioner asserts ineffective assistance of trial

5   counsel for: (1) calling Petitioner a liar multiple times during closing argument and thus,

6   prejudicing Petitioner by tainting his character before the jury; and (2) failing to present evidence

7   that the victim was not being truthful at trial. (ECF No. 20 at 7–8). In his fourth claim for relief,

8   Petitioner asserts ineffective assistance of appellate counsel for failing to raise ineffective

9   assistance of trial counsel (as set forth in the second and third claims) on direct appeal. (Id. at

10  10). Respondent argues the rejection of the ineffective assistance of counsel claims was

11  reasonable. (ECF No. 25 at 12–15).

12      1. *Strickland* Legal Standard

13      The clearly established federal law governing ineffective assistance of counsel claims is

14  Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1)

15  "counsel's performance was deficient," and (2) "the deficient performance prejudiced the

16  defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that

17  "counsel's representation fell below an objective standard of reasonableness" and "that counsel

18  made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

19  defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance

20  is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within

21  the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a

22  petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional

23  errors, the result of the proceeding would have been different. A reasonable probability is a

24  probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether

25  it is 'reasonable likely' the result would have been different. . . . The likelihood of a different

26  result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland,

27  466 U.S. at 696, 693).

28  ///

1   When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of

2   the Strickland standard was unreasonable. This is different from asking whether defense

3   counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover,

4   because Strickland articulates "a general standard, a state court has even more latitude to

5   reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance,

6   556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The

7   standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two

8   apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for

9   claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in

10  order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v.

11  Donald, 575 U.S. 312, 316–17 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When

12  this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any

13  reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S.

14  at 105.

15          2.   Trial Counsel's Closing Argument

16          In his second claim for relief, Petitioner asserts ineffective assistance of trial counsel for

17  calling Petitioner a liar multiple times in his closing argument, which in turn prejudiced

18  Petitioner by tainting his character and leaving no room for the jury to believe Petitioner's

19  testimony. (ECF No. 20 at 7). Respondent argues that rejecting a challenge to counsel's

20  argument was reasonable because a fairminded jurist could find that: it was proper for counsel to

21  disclose when counsel knows his client has lied in testimony; counsel's argument had no impact

22  on the jurors because they already had compelling evidence that Petitioner was the sort of person

23  who would lie to police in pretrial statements; and counsel only addressed a prospect that the

24  prosecution would argue Petitioner lied pre-trial when speaking to police and that counsel

25  actually urged jurors to find Petitioner had not lied.

26          This claim was raised in all three of Petitioner's state habeas petitions. (LDs 29–31). The

27  Kern County Superior Court denied relief, stating: "Lack of success as counsel does not equate

28  to ineffectiveness of counsel. Petitioner must prove that the performance of his trial counsel fell

below an objective standard of reasonableness as measured by prevailing professional norms. He

has not done so." (LD 29 at 2). The California Court of Appeal denied the petition without

prejudice for failure to provide copies of reasonable available documentary evidence necessary

to evaluate Petitioner's claim and for failure to establish that Petitioner exhausted his remedy of

filing first in the superior court. (LD 30). The California Supreme Court summarily denied

Petitioner's state habeas petition. (LD 31). The Court presumes that the California Supreme

Court adjudicated the claim on the merits. See Richter, 562 U.S. at 99. Accordingly, AEDPA's

deferential standard of review applies, and the Court "must determine what arguments or theories

. . . could have supported, the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

During closing argument, defense counsel stated in pertinent part:

> At the beginning of self-defense -- before we start, there's an important part that I think Mr. Cuper [the prosecutor] might bring up in rebuttal.

> When I heard Mr. Vela's testimony, I was like, common [sic] man. Common [sic] man. Why should I believe Mr. Vela was scared for the children and himself when he lied about his gang membership? Why should I believe him?

> Because you'll hear that the Judge is going to give you a suggestion. He's going to give you a suggestion.

> Well, here, before I get to that, the Judge is going to give you an instruction. It says, if you think that somebody lied about something important in this case, you should consider not believing anything that person has to say. That will come from the Judge's own mouth.

> And Mr. Cuper would say, and rightly so, he lied -- he's charged with gang charges. He's lying to you about being a gang member. Why would you believe anything he has to say? He's lying about one, he's lying about the other. Why should you -- I think the law creates the right for men and women. We all experience life together. Why would you believe a liar?

> Well, first of all, I'd state, Mr. Vela got up there and said I never told these three officers that. I never told the police officers I was a gang member.

> All right. They said the opposite.

> Now here we are. The classic -- the classic jury trial dilemma. He says something, police officers say another. What do we do?

> Well, naturally if we weren't in this courtroom, we'd say I believe the cop. I'm not going to believe a felon. Why would I do that for?

The Judge says different. The Judge gives us a specific instruction when it comes to a defendant's statement. That isn't a suggestion, actually. This is an order. So before I talk about the Judge suggesting something, this is an order. This isn't you may. This is you must consider with caution evidence of a defendant's oral statement, unless it's written or otherwise recorded. I missed a word there. Tending to show his guilt. So it's a statement tending to show his guilt.

Here, obviously the People introduce the statement intended to show he was guilty of the gang. But so here we are. We have Mr. Vela says it didn't happen. Officers say -- realize only questions I asked during cross-examination were, did you record it? And I asked that question because I knew the Judge was going to order you to do this.

So what would you do? You have to -- so you have Mr. Vela versus the police officers. Outside this courtroom, that's fine. You believe the police officers. I have no problem with that. But inside this courtroom, you took an oath to follow the law. You took an oath. You must follow this. So it breaks towards him.

Isn't that weird? He gets it. He gets the benefit. He gets the benefit that he never said it. Weird. I mean, it's just so something contrary. I mean, why does that happen?

Perhaps because in criminal trials when the defendants are charged with crimes and they make incriminated statements and they're not recorded, perhaps it's sometimes not true, or perhaps we as a society say before we can convict somebody of a crime, we want to hear the words come out of his mouth himself. We want to hear it, record it, see him speak it.

This is a criminal trial, for goodness sake. We're making sure it's done by the book. And what's not done by the book, we have -- we have to consider with caution.

But I guess my thing is, he's got the tattoos. That ES. What does it stand for? Eastside. Common [sic]. And this is what I'm talking about. That should be the Judge's suggestion. Don't believe a liar. I just said it. If you decide that a witness, Mr. Vela, lied about something significant, gang membership is significant, you should consider no believing anything he says.

Continue this slide. However, the Judge's suggestion goes on. It's the next sentence in that; or if you think a witness lied about some things, but told the truth about the other, you may simply accept the part that you think is true and ignore the rest.

So this is, the Judge suggests to you that sometimes in a criminal trial, witnesses lie about one thing, but tell the truth about others. People have motives to lie. And I submit to you that Mr. Vela has to go back to his community. And you don't think that word catch he admit he's a gang member under penalty of perjury, you're crazy.

Officer Romero sat here this whole entire trial. He was never even called to the scene that night. He stayed until my client testified. Why? Because it's the best workup you can ever do on a criminal defendant.

///

1    If he got up there, he's be subject to cross-examination by Mr. Cuper. And Mr.
2    Cuper, I best believe, you would go up there and talk to Mr. Vela about all his
     gang contacts.

3    They call that snitching. And snitching is a death sentence. So he knows this man
     has to go back to that community one day. This man has to go back to jail one day
4    and trust that this man won't say anything about it. This man hung out because he
     knew he could potentially get a lot of entail [sic] from a man admitting to being a
5    gangster. Because if he admits to being a gangster, he's got to spill it. He's got to
     spill it all. He's got to talk with his gang contacts, got to talk about his buddy.
6    He's got to talk about his homies. He's got to talk about them all.

7    Do you know this member? Yes. Do you know that member? Yes. That is
     incredibly dangerous. I hope and pray that some of you may understand how
8    dangerous that would be for that man. And he'll never admit it, but it's dangerous
     for him. And the law has allowed us to do that.
9
     Sometimes people lie about things, but they're not lying about others. Some
10   people lie. It has nothing to do with the fact they're not telling the truth. They're
     just asked to say they're lying to save their own skin. They're lying because they
11   have to live a life after this.

12   We all get to go home. We all get to not think about gang stuff. We're not
     growing up on the eastside. But it's a -- it's hard for a man like this, with ES on
13   his tattoo. Some of us haven't walked a day in his shoes, so don't think why
     would he lie about it.
14

15   (9 RT 2106–10).

16          Viewed in context, a fairminded jurist could reasonably determine that counsel did not

17   concede that Petitioner lied when he testified that he did not tell police officers he was a gang

18   member, but rather counsel was countering the prosecution's anticipated argument that Petitioner

19   lied when speaking to the police before trial. In fact, at the start of this portion of counsel's

20   closing argument, he specifically stated, "there's an important part that I think Mr. Cuper [the

21   prosecutor] might bring up in rebuttal." (9 RT 2106). Trial counsel also emphasized the court's

22   instructions and specifically noted that although the jury and many people may instinctively

23   believe police over a criminal defendant, a criminal trial is different and the defendant receives

24   the benefit of the doubt when considering evidence of a defendant's oral statement tending to

25   show his guilt unless it's written or otherwise recorded. (9 RT 2107–08). It appears that defense

26   counsel also provided an alternative argument in the event that the jury believed Petitioner was

27   being untruthful regarding his pretrial statements to police. Counsel directed the jury's attention

28   to another court instruction that "if you think a witness lied about some things, but told the truth

29

about the other, you may simply accept the part that you think is true and ignore the rest," (9 RT 2108), and provided an explanation for Petitioner's testimony, which a fairminded jurist could reasonably conclude was a legitimate trial strategy in light of Petitioner's tattoos. Further, the Court notes that the jury "rejected the gang enhancement allegations," Vela, 2019 WL 457665, at *3 n.6, which was the disputed issue between Petitioner's testimony and the officers' testimony. (9 RT 2106 ("Mr. Vela got up there and said I never told these three officers that. I never told the police officers I was a gang member. All right. They said the opposite. Now here we are. The classic -- the classic jury trial dilemma. He says something, police officers say another.")). Therefore, Petitioner has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. See Fairbank v. Ayers, 650 F.3d 1243, 1255 (9th Cir. 2011) ("Even though at times trial counsel did not paint Fairbank in the most sympathetic light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade." (internal quotation marks and citation omitted)); Davis v. Woodford, 384 F.3d 628, 651 (9th Cir.2003) (holding that defense counsel's "unusual" strategy of being antagonistic to the jury in closing argument did not violate Strickland).

Based on the foregoing, under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the state court's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of counsel based on trial counsel's closing argument.

3.   Failure to Introduce Impeachment Evidence

In his third claim for relief, Petitioner asserts that trial counsel was ineffective for failing to present Petitioner's jail records in order to establish that the Sammy's testimony regarding a prior confrontation with Petitioner was false. Specifically, Petitioner contends that because he was incarcerated well before and well after the alleged date of the prior confrontation, this prior

confrontation could not have occurred and Sammy lied at trial when he testified about said prior

confrontation. (ECF No. 20 at 8). Respondent argues that rejecting a challenge to counsel's

failure to present the jail records was reasonable because a fairminded jurist could conclude it

was objectively reasonable for counsel not to wade into the minutiae of the date of the prior

confrontation. Petitioner also did not present the state court with any records amounting to

admissible and clear proof that Petitioner was incarcerated on the precise date testified to by

Sammy. (ECF No. 25 at 13–15).

This claim was raised in all three of Petitioner's state habeas petitions. (LDs 29–31). As

noted in section IV(B)(2), the Court presumes that the California Supreme Court adjudicated the

claim on the merits, see Richter, 562 U.S. at 99, and the Court "must determine what arguments

or theories . . . could have supported, the state court's decision; and then it must ask whether it is

possible fairminded jurists could disagree that those arguments or theories are inconsistent with

the holding in a prior decision of [the Supreme] Court," id. at 102.

With respect to this alleged prior confrontation, the California Court of Appeal stated:

> Sammy and Jeannette both testified that Ramirez and Vela had
> come to their house one time prior to the crime and accused their
> children of stealing a skateboard from Ramirez's children. Vela
> denied being present for any such confrontation and said he was in
> custody during that period of time, but he acknowledged hearing
> that Jeannette's children had stolen toys from Ramirez's yard.

Vela, 2019 WL 457665, at *2 n.5. On direct and cross-examination, Jeannette testified that she

did not remember when Ramirez and Petitioner had come to her house regarding the skateboard.

(5 RT 1135, 1153). On direct examination, Sammy testified that Ramirez and Petitioner came to

the house about a year before the November 22, 2015 incident. (3 RT 706). On cross-

examination, Sammy testified as follows:

> Q.  Now, you told us that you had prior experience with these folks
>     regarding the accusation that your stepsons had taken a
>     skateboard. Do you remember that?
>
> A.  Yes.
>
> Q.  That was the only other time you've seen these folks?
>
> A.  Yes.

1

2   Q.  And you told us today that that was about a year before the
        incident?

3   A.  Yes.

4   Q.  So that would be around November of 2014?

5   A.  No. It was the summertime.

6   Q.  It was the summertime. So it wasn't a full year before?

7   A.  No.

8   Q.  November is in the fall, right?

9   A.  Yes.

10  Q.  So the summer would be, what, June or July?

11  A.  I would say August.

12  Q.  August? So two, three months before this?

13  A.  Yes.

14  Q.  All right. So it wasn't a full year. It was just about three months
        before.

15  A.  Yes.

16  Q.  And you're certain that it was only a couple months before.

17  A.  Yes.

18  Q.  No doubt in your mind.

19  A.  No doubt.

20

21  (3 RT 722–23). Petitioner testified that he did not confront Sammy in the summer of 2015

22  because he was in custody. (8 RT 1729).

23        A fairminded jurist could determine that counsel reasonably chose not to introduce

24  evidence of Petitioner's jail records in order to contest Sammy's testimony that the alleged prior

25  incident occurred in the summer of 2015 because it would not have been an effective form of

26  impeachment. For example, the date was less important than the events of the prior incident and

27  defense counsel could have anticipated that the prosecutor would persuasively argue to the jury

28  that the events of the prior incident mattered and not the fact that Sammy incorrectly

32

1   remembered the date of said incident. Counsel could have concluded that the impeachment

2   evidence would have limited impact on the jurors who could recall that defense counsel's

3   questions steered Sammy to arrive at the revised date estimate in the first place. Counsel also

4   could have concluded that in light of Jeanette's testimony that corroborated the events but did

5   not confirm any date, introducing extrinsic evidence (rather than relying on Petitioner's

6   testimony regarding his custodial status) to dispute a single detail of Sammy's testimony might

7   draw negative attention from the jury. Cf. United States v. Molina, 934 F.2d 1440, 1448 (9th Cir.

8   1991) ("From a strategic perspective, for example, many trial lawyers refrain from objecting

9   during closing argument to all but the most egregious misstatements by opposing counsel on the

10  theory that the jury may construe their objections to be a sign of desperation or hyper-

11  technicality.").

12          Based on the foregoing, Petitioner has not overcome the "strong presumption that

13  counsel's conduct falls within the wide range of reasonable professional assistance," Strickland,

14  466 U.S. at 689, and under the "doubly deferential" AEDPA review of ineffective assistance of

15  counsel claims, the state court's denial was not contrary to, or an unreasonable application of,

16  clearly established federal law, nor was it based on an unreasonable determination of fact. The

17  decision was not "so lacking in justification that there was an error well understood and

18  comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562

19  U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of

20  counsel based on trial counsel's failure to introduce Petitioner's jail records to impeach the

21  victim's testimony.

22          4.   Appellate Counsel

23          In his fourth claim for relief, Petitioner asserts that appellate counsel was ineffective for

24  failing to raise the ineffective assistance of trial counsel on direct appeal. (ECF No. 20 at 10).

25  This claim was raised in Petitioner's state habeas petitions filed in the California Court of Appeal

26  and the California Supreme Court. (LDs 30, 31). As noted in section IV(B)(2), the Court

27  presumes that the California Supreme Court adjudicated the claim on the merits, see Richter, 562

28  U.S. at 99, and the Court "must determine what arguments or theories . . . could have supported,

1 the state court's decision; and then it must ask whether it is possible fairminded jurists could

2 disagree that those arguments or theories are inconsistent with the holding in a prior decision of

3 [the Supreme] Court," id. at 102.

4          Appellate counsel does not have a constitutional obligation to raise every nonfrivolous

5 issue on appeal. Jones v. Barnes, 463 U.S. 745, 754 (1983). In fact, the "process of 'winnowing

6 out weaker arguments on appeal and focusing on' those more likely to prevail, far from being

7 evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray,

8 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751–52). As set forth in sections IV(B)(2)–

9 (3), *supra*, the state court's denials of Petitioner's ineffective assistance of trial counsel claims

10 were not objectively unreasonable. Therefore, Petitioner has not established that there is "a

11 reasonable probability that . . . the result of the proceeding would have been different" had

12 appellate counsel raised a trial-counsel-based ineffective assistance claim regarding the closing

13 argument and introduction of impeachment evidence on direct appeal. Strickland, 466 U.S. at

14 694.

15          Under the "doubly deferential" AEDPA review of ineffective assistance of counsel

16 claims, the state court's denial with respect to appellate counsel's failure to raise trial counsel's

17 alleged errors on direct appeal was not contrary to, or an unreasonable application of, clearly

18 established federal law, nor was it based on an unreasonable determination of fact. The decision

19 was not "so lacking in justification that there was an error well understood and comprehended in

20 existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

21 Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be

22 denied.

### V.

### RECOMMENDATION

25          Accordingly, the undersigned HEREBY RECOMMENDS that the second amended

26 petition for writ of habeas corpus be DENIED.

27          This Findings and Recommendation is submitted to the assigned United States District

28 Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

1  Rules of Practice for the United States District Court, Eastern District of California. Within

2  **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

3  written objections with the court and serve a copy on all parties. Such a document should be

4  captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

5  objections shall be served and filed within fourteen (14) days after service of the objections. The

6  assigned United States District Court Judge will then review the Magistrate Judge's ruling

7  pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within

8  the specified time may waive the right to appeal the District Court's order. Wilkerson v.

9  Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th

10  Cir. 1991)).

11

12  IT IS SO ORDERED.

13  Dated:   **January 24, 2022**                     /s/ Erica P. Grosjean

14                                        UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28